IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JUSTON C.,[1]

        Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____

Civ. No. 6:19-cv-1649-MC

OPINION AND ORDER

MCSHANE, Judge:

        Plaintiff brings this action for judicial review of the Commissioner's decision denying his application for disability insurance benefits. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). On January 11, 2016, Plaintiff filed an application for benefits, alleging disability as of February 5, 2015. Tr. 16.[2] After a hearing, the administrative law judge (ALJ) determined Plaintiff was not disabled under the Social Security Act. Tr. 16-25. Plaintiff argues the ALJ erred in finding him less-than fully credible, in failing to develop the record, and in rejecting the lay witness testimony of Plaintiff's wife. Because the ALJ erred in finding Plaintiff not credible as to the symptoms from longstanding headaches, and because the record demonstrates Plaintiff is disabled under the Act, the Commissioner's decision is REVERSED and this matter is remanded for an award of benefits.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party in this case.
[2] "Tr" refers to the Transcript of Social Security Administrative Record provided by the Commissioner.

1 – OPINION AND ORDER

**STANDARD OF REVIEW**

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

**DISCUSSION**

The Social Security Administration utilizes a five-step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920 (2012). The initial burden of proof rests upon the claimant to meet the first four steps. If the claimant satisfies his burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner must show that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id*. If the Commissioner fails to meet this burden, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant

numbers in the national economy, the claimant is not disabled. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

The ALJ determined Plaintiff had the following severe impairments: status-post craniectomy for removal of sinus venous thrombosis; status-post cerebral vascular accident ("CVA"); headaches/migraines; obesity; and sleep apnea. Tr. 18. At issue here is whether the ALJ provided clear and convincing reasons for finding Plaintiff not credible as to symptoms of his headaches.

At the July 2018 hearing, Plaintiff testified regarding his headaches and his activities of daily living. The testimony mirrored the evidence contained in hundreds of pages of treating notes from multiple providers.[3] Those providers ranged from a primary care physician, a psychiatrist, a neurologist, and a headache specialist. The treatment notes portray a consistent picture of longstanding headaches following Plaintiff's 2015 hospitalization and brain surgery. And while Plaintiff's condition did wax and wane, the treating record consistently indicates Plaintiff never received more than temporary relief from migraines. As noted, the treating records are quite consistent with Plaintiff's testimony at the hearing.

Plaintiff testified that since his "accident," he was a stay-at-home-father who cooked meals from scratch, did chores around the house, took his children to school. Despite having few exertional limitations, Plaintiff testified as to his daily headaches:

> Again, it's very dependent on if I have headaches that day or just generally how I'm feeling. There's times where I will go to the store and I get overstimulated and I have to take a break, where it's, I go to a quiet room and there's no loud noises or anything like that and I have to reset my brain. And so that hinders progress.

Tr. 51.

---

[3] Plaintiff's wife provided a third-party function report. Her statement mirrors Plaintiff's own testimony and his statements to providers over the course of three years.

3 – OPINION AND ORDER

Although his headaches "have gotten better," he still suffered headaches most afternoons. Tr. 52. Plaintiff had different types of headaches. Some were chronic. Some were sharp, stabbing headaches that completely incapacitated Plaintiff for a few minutes. Tr. 52 ("[I]t's hard to quantify it. . . . Yes, it's not as much as all day long, but I still am having various headaches that go up to about four hours a day. Some of those only last for about 20 seconds, but they're strong enough to where they actually get me to stop what I'm doing and cringe because of how intense they are."). The incapacitating headaches were "cluster headaches," and Plaintiff experienced them most afternoons. Tr. 53. Although they used to occur around noon, at the time of the hearing they occurred in the evening. "They come off and on and sometimes up to bedtime." Tr. 53. The cluster headaches were "intense," but only during the headache where his "head's pounding and then it goes away." Tr. 54. These headaches occurred "all of a sudden, it's like somebody shot a bullet in my head and it's just excruciating." Tr. 62.

Plaintiff stated he had some relief with medicine (Indomethacin), but suffered hearing loss as a side effect. Tr. 54. Because of the hearing loss, Plaintiff dropped down in dosage and correspondingly suffered increased headaches. Tr. 55. Plaintiff testified that within the first year of "my episode," he had improvement with his headaches. But three years after the stroke, Plaintiff still suffered from random headaches in different parts of his head that will last "for 30 minutes or sometimes a couple hours, so—but it's random, so it's hard to quantify it." Tr. 57. Because he suffered daily headaches for several years, Plaintiff "learned how to cope with these" and would "go take a break" by going "to a quiet room and lay[ing] down, usually on the floor." Tr. 57-58.

Plaintiff testified that although he did chores around the house during the day, he accomplished this only because he took breaks during the day when he had a headache or was

overstimulated. Tr. 58-59. "The overstimulation, I have to constantly take breaks." Tr. 59. Plaintiff called his sister to pick up his child from school when headaches prevented Plaintiff from driving. Tr. 67. Plaintiff felt although he could "barrel through it for a couple days" in a regular work setting, this would catch up to him and "I might have to lay down for a couple hours or the next day, I feel awful enough, to where I'm not hardly doing anything." Tr. 69. The ALJ accurately summarized Plaintiff's testimony:

> At the hearing, the claimant testified that he loses his thought process sometimes and is forgetful. He noted that his level of activity depends on how he feels that day. He said he can become over stimulated when he goes to the store and needs to take a break in a quiet room. He further testified that he has a plethora of medication side effects and that headaches still occur. He noted some headaches can last for hours at a time and that others occur in clusters. The claimant testified that he also takes breaks when doing household tasks due to overstimulation. He further explained that when he walks around he has his hands out due to imbalance. He said being overstimulated occurred unpredictably and multiple times a week. He said he would be unable to do even a sedentary, simple job.

Tr. 21.

The ALJ noted Plaintiff's "long complex hospitalization complicated by a mid-brain ischemic stroke and profound somnolence." The ALJ noted that after Plaintiff "awoke from an essential coma," he was discharged in mid-March 2015. Tr. 21. The ALJ concluded, "Notably, however, medical improvement did occur within a couple of months of the alleged onset date." Tr. 21. The ALJ pointed to treatment notes from April 2015 where Plaintiff "reported he was recovering well. . . . [and] was 'remarkably improved' since his hospital admission and back to performing most of his activities of daily living except driving." Tr. 21. The ALJ noted that Plaintiff's headaches resolved by June 2015 and treatment notes indicated continued improvement into 2016. The ALJ also noted medication resulted in decreased frequency and severity of Plaintiff's headaches.

5 – OPINION AND ORDER

The ALJ then noted Plaintiff activities of daily living indicated Plaintiff's condition had improved. For instance, the ALJ noted Plaintiff "remained capable of renovating rooms in his house, which entailed painting and redecorating, as well as writing and illustrating a children's book" Tr. 22. Plaintiff also volunteered at school, did yard work, and did meal planning, shopping, and cooking.[4]

Despite summarizing Plaintiff's lengthy and complex medical history, the ALJ pointing to isolated instances of improvement in concluding Plaintiff did not suffer significant symptoms from headaches. When viewed in context of the record-as-a-whole, this was error. *See Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (noting "Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."). The record demonstrates that while Plaintiff at times suffered less-frequent and less-severe headaches, he generally suffered from daily headaches throughout the time period at issue.

As noted, the ALJ concluded that "by the end of June 2015, the claimant disclosed his headaches resolved[.]" Tr. 21. While June 2015 notes from Plaintiff's neurologist indicate Plaintiff reported doing better and received some relief with Tylenol, the notes also state, "He continues to have daily headaches and photophobia with occasional dizziness." Tr. 1995. Plaintiff became overstimulated in crowds or while shopping. Tr. 1995. Increased exertion, such as with yoga, increased his headaches. Tr. 1995. Plaintiff complained of vertigo when moving his head or lying down. Whatever improvement Plaintiff experienced was short-lived.

---

[4] None of these activities are inconsistent with Plaintiff's testimony that he is severely incapacitated several times each week from random headaches which often require him to go lie down on the floor of a dark room. Plaintiff never alleged significant physical limitations.

In January 2016, Plaintiff's primary care physician noted that "His headache seemed to be better for a while but now have returned, he has 2 varieties 1 as a general aching and he usually goes to bed after taking some Tylenol, the other headache is a momentary severe headache. Comes randomly might last for an hour or so and goes away." Tr. 2024. "He continues to [be] overwhelmed with stimulation for example patterns, colors, crowds, noise, is an overwhelming sense of fatigue and needing to avoid these situations." Plaintiff had a generalized sense of fatigue and took long naps daily. Although Plaintiff was "doing well on long-term aspirin 81 mg daily," his physician noted Plaintiff had "really not made a lot of progress over the last 9 months." Tr. 2025.

Treatment notes from April 2016 indicate "His headaches are unpredictable, they usually are a gripping severe headache for a few seconds then remitting occurring every few minutes some days much worse than others. He is having a cranial CT next week and hoping to have hardware removed from the skull in hopes of improving his headache pattern." Tr. 2027. While Plaintiff made "slow but encouraging progress," his doctor confirmed that "Headaches are still an issue." Tr. 2027.

The record reveals that during the three years at issue, Plaintiff's treating physicians constantly changed and attempted to fine-tune medications to provide relief from overwhelming and chronic headaches. Although Plaintiff's neurologist prescribed Topiramate, this was discontinued in September 2016 when Plaintiff had suicidal thoughts.[5] Tr. 2031. Although Plaintiff's neurologist switched to Gabapentin, "This is making his head feel[] like it is squeezed. The pain is global." Tr. 2058. Although Gabapentin dulled Plaintiff's headaches, a side effect was drowsiness. Tr. 2060 (noting Gabapentin made Plaintiff "very tired"). During this time

---

[5] The ALJ concluded the record contained "reports of only mild depression and improvement with medication management." Tr. 20. The record, however, contains multiple references of Plaintiff's depression (medication induced or otherwise) resulting in suicidal thoughts.

7 – OPINION AND ORDER

period (in late 2016), which the ALJ pointed to as continued improvement, treating notes indicate "He continues to have an overwhelming sense of sensory overload if he is exposed to patterns, color, or noise, this seems to be getting worse." Tr. 2061. Although the Gabapentin dulled his severe headaches, Plaintiff continued to experience the "constant squeezing headache" and the medication exacerbated his insensitivity to light. Tr. 2061. In November 2016, after noting Gabapentin made Plaintiff sleepy, his doctor noted:

> He has increased overstimulation that had improved previously. The grocery store is particularly difficult. Previously he was able to tolerate 30 minutes of shopping and now the issue is immediate or within a few minutes. The gabapentin has helped with the sharp shooting pains but he continues to have a chronic daily headache. He tried different doses and this helped some with the sensory changes.

Tr. 2053.

Five months later, Plaintiff had an increase in headaches, followed by some improvement following another change in medication. Tr. 2049. Although Plaintiff had some relief from headaches, his short-term memory suffered. Tr. 2049 (noting difficulties with short term memory and Plaintiff and wife make lists to remind Plaintiff of tasks). Even during this time of decreased symptoms from the sharp headaches, Plaintiff "continues to have chronic daily headache and photophobia." Tr. 2051. Plaintiff's doctor referred Plaintiff to a headache specialist "for continued chronic daily headaches despite multiple treatment trials." Tr. 2052.

In April 2017, Plaintiff reported sharp, debilitating headaches "7-10 times a day, and occasional low-grade headache lasting 2 hours 2-3 times a week." Tr. 2064.[6] That month, Plaintiff's neurologist noted Plaintiff's chief complaint was headaches. Tr. 2087. Plaintiff reported multiple types of headaches to his neurologist:

---

[6] Even amongst several different providers, Plaintiff's reporting remained consistent. For example, Plaintiff's psychiatrist noted in July 2017 that Indomethacin resulted in "remarkable improvement" in Plaintiff's headaches. Tr. 2017. Even with this improvement, however, Plaintiff suffered over 10 severe headaches each week and "His overstimulation symptoms seem worse." Tr. 2070.

8 – OPINION AND ORDER

1) "Fast headache": No distinct sense of location, "severe enough to stop me in my tracks," duration "10-20 seconds", frequency multiple times per day, 30/30 days.
2) "Evening headaches". Mostly on the R side. Duration 4+ hours, "miserable…Annoying…Fatiguing…Aches…But I can still get up to do stuff, sometimes", "usually he goes and lays down". 25+/30. + Photo, + Phono, + nausea.
3) "Midbrain headaches": "They also make me go lie down."
4) "Screws in my head tender headaches" attributes to hardware from craniotomy.

Tr. 2088.

Plaintiff's neurologist noted Plaintiff's headaches did "not have a specific treatment" and were "high complexity." Tr. 2089. In July 2017, Plaintiff's neurologist reported headaches appeared to be resolved. Tr. 2098. Plaintiff reported an increase in his quality of life after using Indomethacin. Tr. 2101. Once again, this improvement was short-lived. Just a few months later, Plaintiff's neurologist noted, "He reports headache frequency has increased to daily and headache presentation has changed since starting Lamictal. Prior to starting the Lamictal headaches were occurring two days per week. He reports hearing loss and ear pain bilaterally since starting Indomethacin." Tr. 2102. "Presentation of headaches have changed since starting Lamictal. Headache presents in the right temporal region with an aching, moderate pain. Duration of headache has changed. Headaches are now lasting several hours vs 1-2 minutes. He has associated photophobia and phonophobia. he often needs [to] lie down in a dark, quiet room." Tr. 2102.

Two months later, Plaintiff's neurologist discontinued Indomethacin due to side effects of ear pain and hearing loss. Tr. 2107. "He reports constant headache in the right frontotemporal region and right occipital region with constant dull to irritating to aching, mild to moderate pain with intermittent sharp, severe pain in the right temporal region. Intermittent, severe episodes last seconds, but he has multiple episodes throughout the day." Tr. 2107.

9 – OPINION AND ORDER

Just a few months before Plaintiff's July 2018 hearing before the ALJ, Plaintiff's providers were still tinkering with different medications in attempt to provide headache relief. Tr. 2082 (noting Indomethacin helped with the severe headaches but he suffered "a more generalized headache" after his psychiatrist prescribed Lamictal and Verapamil). In addition to headaches, Plaintiff continued to suffer from overstimulation and often was "unable to function" due to overstimulation looking at different colors at the grocery store. Tr. 2082. At this time, Plaintiff suffered increased side effects from his medication. Tr. 2077 (noting Indocin "works for HAs but the ears get swollen and he gets muffled hearing" along with balance, overstimulation, and memory issues). In March 2018, Plaintiff changed medications again after suffering additional headaches and a side effect of tinnitus. Tr. 2083. Plaintiff "Was getting sensation of electrical surges in his head on Lamictal." "Having dizzy spells last few weeks, feeling a certain wobbly feeling. No falls, however." Tr. 2083.

Two months before the hearing, Plaintiff and his neurologist believed Lamictal was resulting in more headaches and "brain zaps" when Plaintiff turned his head. Tr. 2084. Plaintiff's psychiatrist noted, "So after he reached a point that he couldn't function due to the HAs, he decreased the dose to 75 mg/day then 50 mg/day. But depression came back rapidly. Looking for options. . . . Memory issues persist and he will have neuropsychological retesting soon[.]" Tr. 2084. Plaintiff's neurologist noted, "He reports 2 episodes per day of sudden onset of headache that last 20 seconds. . . . He still has some degree of daily, constant headache that feels 'midbrain' with pressure to dull, mild pain. He has associated photophobia and phonophobia. Even though the reports headache severity is mild he feels the need to lie down and take a nap due to headache." Tr. 2112. Plaintiff's neurologist confirmed that the headaches and overstimulation "is a normal response [to] the type of brain injury he sustained." Tr. 1989.

The ALJ erred in concluding the record demonstrated Plaintiff's headaches were resolved with medication. *See Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) (ALJ may not "cherry-pick" isolated examples of improvement without consideration of the overall treating record). Although Plaintiff reported periods of "fairly infrequent" headaches, Tr. 2117, the record-as-a-whole demonstrates that these were brief lulls during a three-year period where treating notes consistently indicated Plaintiff's headaches required him to lie down in a dark room at random times throughout the day. Although the ALJ pointed to Plaintiff's robust daily activities, none of Plaintiff's activities were inconsistent with his (consistent) statements that random, daily headaches required him to lie down in a dark room at random times during the course of the week.

As the ALJ erred, the question is whether to remand for further administrative proceedings or an award of benefits. Generally, "when an ALJ's denial of benefits is not supported by the record, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012), quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). However, an award of benefits can be directed "where the record has been fully developed and where further administrative proceedings would serve no useful purpose." *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Remand for calculation of benefits is only appropriate where the credit-as-true standard has been satisfied, which requires:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014) (citations omitted).

11 – OPINION AND ORDER

This is a rare instance where remand for an award of benefits is appropriate. The vocational expert testified that one who misses more than one day of work each month or is off task more than 10% of the time would not be able to maintain employment. Tr. 78-80. More importantly, the expert testified that having to lie down at random times throughout the workday "would rule out competitive employment." Tr. 80. As Plaintiff consistently testified—and that testimony is supported by hundreds of pages of treating notes—that he routinely had to lie down on the floor of a dark room due to random, severe headaches, he is disabled under the regulations.[7]

## CONCLUSION

The decision of the Commissioner is REVERSED and this matter is REMANDED to the Commissioner for the immediate calculation and payment of benefits.

IT IS SO ORDERED.

DATED this 29th day of March, 2021.

                                                  _____/s/ Michael J. McShane_____
                                                        Michael McShane
                                                United States District Judge

---

[7] Plaintiff's primary care provider and psychologist submitted letters stating Plaintiff would have difficulty maintaining consistent employment. Those opinions, along with the statement from Plaintiff's wife, provide additional support for the conclusion that Plaintiff's headaches render him unable to sustained employment.

12 – OPINION AND ORDER